UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————————

KEVIN KEMP,

                          Plaintiff,

          - against -                            01-CV-1205 (NAM)

M. KENNY, T. ASHLAW, A. LASHWAY,

                        Defendants.

———————————————————————————

**APPEARANCES**                                **OF COUNSEL:**

KEVIN KEMP, 97-A-2889
*Plaintiff Pro Se*
Wyoming Correctional Facility
P.O. Box 501
Attica, New York 14011-0501

ELIOT SPITZER                           Patrick F. MacRae, Esq.
Attorney General of the State of New York    Asst. Attorney General
New York State Department of Law
615 Erie Boulevard West, Suite 102
Syracuse, New York 13204

NORMAN A. MORDUE, United States District Judge

**MEMORANDUM-DECISION AND ORDER**

**I.     INTRODUCTION**

     Plaintiff, an inmate in a state correctional facility alleged at trial that his federal civil

rights were violated by the conduct of defendant Kenny, a corrections officer, who intentionally

disregarded plaintiff's health and safety when he administered a blood sample test on him

involving a hypodermic needle when defendant Kenny was not licensed or trained to conduct

such a test.  Plaintiff alleged that defendants Ashlaw and Lashway were deliberately indifferent

to the violation of his constitutional rights because they witnessed defendant Kenny performing

an "unauthorized medical procedure" on him and did nothing.  This Court dismissed plaintiff's

complaint at the end of plaintiff's proof after trial in December 2003.

   The Court denied plaintiff's motion for a new trial based *inter alia,* on the Court's

alleged error in asking Magistrate Judge Peebles conduct jury selection in this case due to a trial

scheduling conflict.  On remand from the Second Circuit Court of Appeals, this Court is called

upon to determine whether plaintiff consented to have Magistrate Judge Peebles conduct jury

selection even though he expressly did not consent to the Magistrate Judge presiding over the

ensuing trial.

## II.    DISCUSSION

   The Federal Magistrate Act of 1979 expanded the power of magistrate judges by

authorizing them to conduct "any or all proceedings in a jury or nonjury civil matter and order

the entry of judgment in the case," as long as they are "specially designated . . . by the district

court" and are acting "[u]pon the consent of the parties." 28 U.S.C. § 636(c)(1).  The Supreme

Court has held that consent to a magistrate judge's involvement in a case may be inferred from

a party's conduct during litigation.  *Roell v. Withrow*, 538 U.S. 580, 586 (2003).

   On the date that plaintiff's trial was scheduled to begin, the Court was already engaged

in presiding over another case that had taken longer than expected to try.  In the interest of

saving time and effort on the part of all involved parties, prospective jurors and Court

personnel, the Court asked Magistrate Judge Peebles to conduct jury selection even though

plaintiff had asked that this Court preside over the actual trial.  Magistrate Judge Peebles

advised all present during jury selection that he would only be conducting that limited part of

the trial and that Judge Mordue would be presiding over the case when the trial began the

2

following week  Counsel for all parties conducted *voir dire* of the prospective jurors without

raising any objections to the Magistrate Judge's presence.  Plaintiff was seated in the courtroom

at all times during jury selection and raised no objection.  As a further matter, plaintiff raised no

objection to the jury or the jury selection process when trial commenced or at any time prior to

the Court's dismissal of his claims.  Based thereupon, plaintiff "clearly implied [his] consent"

by his decision to appear before Magistrate Judge and participate in jury selection, without

expressing any reservation. *See Roell*, 538 U.S. at 586.

## IV.    CONCLUSION

Based on the foregoing, the Court finds that plaintiff impliedly consented to Magistrate

Judge Peebles conducting jury selection in this case.   Based thereupon, the prior decision of the

Court which denied plaintiff's motion for a new trial on the basis of alleged lack of consent to

the Magistrate Judge's involvement in jury selection stands and plaintiff's motion is again

DENIED.

IT IS SO ORDERED.

Dated: July 1, 2005
      Syracuse, New York [1]

Norman A. Mordue
U.S. District Judge

---

[1]

The full transcript of jury selection proceedings is set forth below for the parties' reference
and for the purpose of the record based on the Second Circuit's remand.

TRANSCRIPT OF CIVIL CAUSE FOR JURY SELECTION
BEFORE THE HONORABLE DAVID E. PEEBLES
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Thomas Blair, Esq. |
| For the Defendant: | New York State Attorney General<br>By:  Patrick MacRae, Esq.<br>Assistant Attorney General |
| Court Transcriber: | SHARI RIEMER<br>TypeWrite Word Processing Service<br>356 Eltingville Boulevard<br>Staten Island, New York 10312 |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

THE CLERK:  The case of <u>Kevin Kemp v. M. Kenny, et al.</u>, 01-CV-1205.

Counsel, please state your appearances for the record.

MR. BLAIR:  Judge, on behalf of the plaintiff,  Tom Blair.

THE COURT:  Good morning, gentlemen.

MR. MACRAE:  Your Honor, Patrick MacRae from the New York State Attorney

General's Office representing the defendants.

THE COURT:  All right.  Good morning.

Let me take this opportunity to welcome all of you to the Northern District of New

York and explain a little bit about the process that we will be following this morning.

First, let me describe for you something that you may have already seen in the

video that was shown to you earlier this morning.

This is a United States District Court.  It is a federal court.  My name is David

Peebles and I am a United States Magistrate Judge.  I like to refer to this as The Peebles Court

and you can laugh if you want now.

4

The United States District Courts which are the trial level courts that handle both civil and criminal cases are divided up into roughly 96 districts throughout the country. This happens to be the Northern District of New York which covers a very large territory equivalent to the states of Massachusetts, Rhode Island, Vermont and Connecticut combined; 3.25 million people live within our District which is comprised of a geographical area that extends up to Canada, east to Vermont and Connecticut, south to just below Kingston, New York and west just west of Auburn, New York. So it's a fairly large territory. We hold court in Binghamton, New York, Utica, Albany and on occasion Plattsburgh.

Federal courts handle both civil and criminal matters. Criminal matters that typically come before this Court include allegations that someone has violated a federal statute. Probably the most obvious one is that someone has stolen money from a federally insured banking institution but we also handle other types of cases; unlawful entry by aliens, drug cases and that sort of thing. We also handle what are known as civil disputes; that is a matter where one party is suing another party seeking various types of relief. It could be monetary relief or it could be some other form of vindication.

This is such a case. This is a civil case. I'll describe a little bit more in detail in a few moments what this case entails as we go forward with the process.

It's important that you recognize the significance of your roles in this case. We will be empaneling a jury of eight members who will be hearing the testimony and seeing the evidence that is admitted in this trial and ultimately deciding the case.

I liken the allocation of responsibility between the jury and me as the Judge or

5

Judge Norman Mordue, who will actually be presiding over the trial, to the responsibilities of

a referee and a judge at a boxing match.  I don't know how many of you ever watch boxing on

television but you know that there is a referee in a striped shirt in the ring whose

responsibility it is to make sure that the fight occurs in accordance with the applicable rules

and when the parties, in this case the lawyers, get to entangled then their sent to their

respective corners by the judge.  You, however, will be the judges who actually sit ringside

and at the end of the fight, assuming that there's no knockout, you are the ones who will

actually be deciding who should win based on what you saw in the ring and what you are told

by the judge is the applicable law that you must apply.  So that's kind of the division of

responsibility.  As you can see, your responsibility and your role in the process is very

significant.

        You should also understand that it is both a privilege and a responsibility that we

all have as United States citizens to serve as jurors in cases such as this.  The United States

has, although it's not perfect, by far the finest judicial system that anyone has ever devised

and it is largely because of the roles that you play as citizens in serving as jurors.  As a matter

of fact, I will probably be sitting in a seat similar to yours next week because I've been

summoned to jury duty in state court.  So I'll see what it looks like from the other side of the

fence next week, although I'm not too sure anyone will be excited about having two judges in

the case; one in the jury box and one sitting up on the bench.

        Let me, first, ask counsel if they will identify themselves and then I'm going to ask

if any of you know of either of these attorneys or their firms and we'll begin the process in

6

that way.

Plaintiff's counsel.

MR. BLAIR:  Good morning, folks.

My name is Tom Blair and I'm an attorney employed at a law firm called Costello,

Cooney & Kira [Ph.], we're in downtown Syracuse.

THE COURT:  Thank you.

MR. MACRAE:  My name is Kenneth MacRae.  I'm an assistant Attorney General

with the New York State Attorney General's Office.

THE COURT:  Does anyone among you know of these gentlemen or anyone that

practices with them either in the Costello law firm or in the New York State Attorney

General's Office?

(No reply)

THE COURT:  All right.

We're off to a good start.

Let me also describe for you the parties that will be involved in this case and the

witnesses that are likely to be called.

The plaintiff in the case, who is seated next to counsel, Mr. Blair, is Kevin Kemp.

Does anyone know Kevin Kemp?

(No reply)

THE COURT:  The defendants in the case who are seated with Mr. MacRae are M.

Kenny, T. Ashlaw and A. Lashway.  They are three employees of the New York State

7

Department of Correctional Services who are or were at one time assigned to the upstate

correctional facility in Malone, New York.

Does anyone know any of these three individuals?

(No reply)

THE COURT:  All right.

We're still on a roll.

Now, I've also been advised that there may be two additional witnesses whose

names I've not yet mentioned that will testify in the case; one is a Darren Collins and the other

is a psychiatrist, Elaine Amberman.  Does anyone know either of these individuals?

(No reply)

THE COURT:  All right.

What I'm going to do is let me begin the process by explaining to you what type of

case we're dealing with and a little bit about the process that will be followed.  I'm then going

to ask if any of you have any basis to believe that you should be excused from jury duty.

Once that has occurred and we have a group of you still seated, hopefully, I'm going to ask

that sixteen of you be seated in the jury box.  We will then go through a process that is known

as jury voir dire or jury selection.  I will ask you to describe your family circumstances, your

background, your employment, any hobbies that you may have and then I will give each

counsel a brief opportunity to follow up any questioning that I did with some questioning of

their own.

It's important that you know that the purpose of this process is not to embarrass

8

anyone.  There will be some questions that we'll seek, perhaps, some information that you feel

is a little bit on the personal side.  What we're trying to do is insure all of the parties that they

will receive the benefit of a fair and impartial jury deciding this case once all of the evidence

is heard.

So to the extent that we may be encroaching a little bit on your privacy, I apologize

in advance but it's unfortunately necessary to insure the integrity of the process and the

fairness to both sides.

Let me tell you a little bit about this action.  This is a civil rights action brought by

the plaintiff Kevin Kemp, who is a former inmate at the upstate correctional facility which is

located in Malone, New York.  His claims are brought against M. Kenny and T. Ashlaw, they

are two corrections officers at the facility, as well as A. Lashway, a nurse employed at the

facility's infirmary.   Plaintiff claims in essence that during the time of his confinement he was

subjected to cruel and unusual punishment in violation of the Eighth Amendment to the

United States Constitution.  The circumstances giving rise to the plaintiff's claims occurred on

August 6, 2000.  Plaintiff contends that on that date he was escorted from his cell to a nurse's

station for physical evaluation due to the fact that at the time he was engaged in a hunger

strike.  While at the nurse's station according to the plaintiff, blood was taken from his left

index finger by defendant Kenny, a corrections officer, in the presence of defendants Ashlaw

and Lashway.  Plaintiff asserts that the blood sample was unlawfully taken by someone not

properly trained or qualified in the handling of blood samples and that as a result of the

incident he has experienced emotional trauma and anxiety, in part, due to his fear that he may

have been exposed to various diseases as a result of the incident.  The defendants deny any

wrongdoing in connection with the alleged incident and specifically deny that the medical

procedures complained of were conducted by anyone other than Nurse Lashway.

       The trial in this matter as I indicated before will be handled by United States

District Judge Norman Mordue.  Judge Mordue for scheduling reasons has a conflict.  He was

scheduled to begin another trial this morning and so this trial was scheduled to begin as soon

as that one ended.  So, unfortunately, there will be a hiatus that can't be avoided between the

jury selection, which is obviously occurring now, and the commencement of the trial which is

going to begin next Tuesday morning, which is December 16th at 9:00 a.m.  The trial will be

held up on the 12th Floor so that once we empanel the jury if I forget to tell you, you'll need

to remember to report to the 12th Floor next Tuesday morning.

       In reviewing the parties' submissions it appears to me very likely that the case will

take no more than two or three days at a maximum so it appears fairly certain that the case

will be completed by next Friday for scheduling purposes in case anyone may want to bring

to my attention any conflicts that you have.

       Let me ask, first, if any of you that feel that given this schedule that I've just laid

out for you it would be an extreme inconvenience or hardship for you to serve as a juror in

this case?  Would you kindly step forward and we'll have a discussion as to the basis for your

request.

       Is there anyone that would like to be considered for excuse?

       All right.

I'm going to ask counsel if you will come forward with me and we'll have an off the record discussion.

(Off the record)

THE COURT:  All right.

Let me ask if any person in the courtroom -- and I think it's probably highly unlikely -- but, nonetheless, let me inquire has anyone of you heard anything about this case, read anything about it in the newspaper or heard anything about it on the radio?

(No reply)

THE COURT:  All right.

Before we place you in the jury box I'm going to ask if each of you would rise and raise your right hand.  I'm going to have my courtroom deputy, Shelly Lazzaro, who is really in charge of this Court, administer an oath.

(Jury panel sworn)

THE COURT:  All right.

At this time I'm going to ask my courtroom deputy to call the first sixteen names on the list which has been compiled at random and we'll ask you to occupy the seats beginning front left, one through eight, and then rear left to right, nine through 16.

THE CLERK:  Joyce Galzer [Ph.], George Lederman, Susan Cole, Patricia Kinslow, Albert Houghton [Ph.], Nancy Piedmonte, Albert Merola, Jennifer Jusz [Ph.], Nancy Denning, Mary Zamora, Philip Fuller, David Bartlett, William Emm, Sandra Dwyer, Walter Melnick [Ph.], Sally Stevens [Ph.].

11

THE COURT:  Now, I hope the four of you don't feel left out.

What I will ask is that as we go through the process if you would kindly pay attention and listen to the questioning.  If there is any reason why any of these jurors it may become necessary to have one of you come and fill their position and so we'll be asking the same questions and you can have your answers prepared.

THE COURT:  Now, unfortunately, because you're lucky No. 1, you get to lead off.

Ms. Galzer, would you kindly stand, just tell us a little bit about yourself; who you are, where you work, what your hobbies and interests are?

MS. GALZER:  I work at an insurance company.  I'm a claims assistant for three adjusters for workers comp.  I do hold three jobs.  I do other part-time jobs working at the Turning Stone Casino in the showroom as an usher and at Hallmark Card Shop as a seasonal type of position.  Some of my hobbies are photography.  I do a lot of volunteer work for the Make-A-Wish Foundation, also the North Side Community Police Center, the mentoring program that they have and also the Empire State Games.

THE COURT:  When do you sleep?

MS. GALZER:  I do get a few hours sleep.

THE COURT:  Very ambitious.

I imagine you see some interesting things and people especially at the Turning Stone.

MS. GALZER:  I certainly do.

THE COURT:  All right.  Well, thank you.

12

Mr. Lederman.

MR. LEDERMAN:  George Lederman from East Syracuse, New York.  I work at DPC in East Syracuse.

THE COURT:  What do you there?

MR. LEDERMAN:  A tool crib attendant.  I hand out tools for different machines for making different parts and keeping inventory.  I really don't have any hobbies.  I like to watch sports.

THE COURT:  I see that you're married and your spouse works with National Grid?

MR. LEDERMAN:  Right.  She's a computer programmer at National Grid and I live in East Syracuse with three kids, two grandchildren and a dog.

THE COURT:  All right.

Are you an empty-nester?

MR. LEDERMAN:  No.  I wish I was.

THE COURT:  All right.  Thank you.

Ms. Cole.

MS. COLE:  I'm Susan Cole and I work for an insurance company, The Hartford, as a team leader.  I supervise about 22 people here in Syracuse, about 13 people in King-of-Prussia.  So I do a lot of traveling.  I have two children who live in Syracuse.  I live in West Monroe and my hobbies are like boating and camping and that's about it.

THE COURT:  What kind of boating?  Sailing or stinkpotting?

13

MS. COLE:  Oh, not sailing.  That's too scary.

THE COURT:  Power boating?

MS. COLE:  Yes.

THE COURT:  What type of insurance work do you do?

MS. COLE:  I oversee two units; one is like a support area and the other is data specialists for data integrity and error correction.

THE COURT:  So you're not involved in claims adjustment, that kind of thing?

MS. COLE:  I don't handle claims, no.

THE COURT:  All right.  Thank you.

Ms. Kinslow.

MS. KINSLOW:  I'm Patty Kinslow and I also work for an insurance company here in downtown as a systems analyst and my hobbies are working a lot, a little bit of reading.

THE COURT:  You enjoy your work?

MS. KINSLOW:  Yes, for now.

THE COURT:  And your spouse is also working where you work so you can keep an eye on him?

MS. KINSLOW:  Yes.

THE COURT:  What does he do at Blue Cross/Blue Shield?

MS. KINSLOW:  He's a data specialist.

THE COURT:  Good.  Thank you.

Mr. Houghton?

Tell us about yourself.

MR. HOUGHTON:  I'm a machinist at Banter Burns [Ph.].  I've been in NC [Ph.] machinery for a while.  I switched to second shift about three months ago after 20 years and I learned some new equipment.  I wanted to stay up with the new stuff.  I have a wife.  She's on disability unemployment from a car accident she had about three years ago.  I have two sons; the youngest is 17, he still lives at home.  I like to golf and I do a lot of health spa kind of --

THE COURT:  What's your handicap?

MR. HOUGHTON:  I shoot under 100.

THE COURT:  Well, I'm right there with you.

Now, your spouse, before her accident she was a secretary?

MR. HOUGHTON:  Yes.

THE COURT:  What type of secretary?

MR. HOUGHTON:  She worked for Hutchins Psychiatric.

THE COURT:  Is she planning to return to work?

MR. HOUGHTON:  She is seeing doctors twice a week and, I don't know, she has trouble moving around.

THE COURT:  Sorry to hear that.

All right.  Thank you.

THE COURT:  Is it Ms. Piedmonte?

MS. PIEDMONTE:  Piedmonte; right.

THE COURT:  How are you this morning?

15

MS. PIEDMONTE:  Fine.  How are you?

My name is Nancy Piedmonte.  I'm retired now, thank goodness.  I worked for Bays [Ph.] for 20 years just before Eckerd took over.  I have three children.  My husband retired about two and a half years ago and I volunteered at St. Joe's for about eight years and then I had a problem with my knees so I stopped that and I won't be going back to that probably in around spring.  My hobbies would be like gardening.

THE COURT:  Your husband retired from the banking business?

MS. PIEDMONTE:  Yes, he worked in Marine Midland for twenty-something years and then they downsized so then he went with Salve [Ph.] doing the same job basically.

THE COURT:  Good.  Thank you.

Do you have any hobbies?  You said gardening?

MS. PIEDMONTE:  Gardening, yes.

THE COURT:  All right.

Mr. Merola.

MR. MEROLA:  My name is Albert Merola.  I'm a retired teacher and coach.  I retired from teaching two years ago and coaching this past fall.  Football and golf were the sports I coached.  I enjoy boating and golfing and most outdoor sports.

THE COURT:  You have a very fine football team.

MR. MEROLA:  Thank you.

THE COURT:  Were you in the dome when Mr. Corliss caught that touchdown pass?

16

MR. MEROLA:  Yes, we were there.

THE COURT:  Were you there when he dropped the other one?  You coached him, I assume?

MR. MEROLA:  Yes.

THE COURT:  All right.

What do you do in you spare time now?

MR. MEROLA:  Well, right now, I'm answering jury duty call but I'm kind of getting ready to just work out at the gym in the morning and then see what develops.

THE COURT:  Good.  Thank you.

Is it Ms. Jusz?

MS. JATCH:  It's actually Jatch.

THE COURT:  I'm sorry?

MS. JATCH:  Jatch.

THE COURT:  Okay.  Ms. Jatch, tell us a little bit about yourself.

MS. JATCH:  I'm a technical assistant at Labs Plus [sic].  I actually work for the [inaudible] work program which helps low income families get low cost in cars [sic].

THE COURT:  What are your responsibilities?  What types of things do you do there?

MS. JATCH:  Pretty much all of it because the job coach that I was working with, her son passed away so she left and she hasn't come back so [inaudible] but I track payments and get applications for any new clients, I pretty much help them [inaudible].  I have three

17

children; two girls and a boy.  My favorite pastime is puzzles other than spending time with

my kids.

THE COURT:  And you're married and your spouse works at Carrier?

MS. JATCH:  Now he works at the Heineman [Ph.] Square Post Office.

THE COURT:  Oh, as a carrier.  Hello.

Okay.  Thank you.

Ms. Denning.

How are you this morning?

MS. DENNING:  Fine.  Thank you.

My name is Nancy Denning.  I'm from [inaudible] and I'm retired now.  I worked

for 30 years with the state court system.  This is my first time here as a juror and, well, let's

see.  Hobbies, I like to do crafts and I'm doing some teacher's aide work in our local

elementary school and I have three grandchildren.  They keep me busy.

THE COURT:  I'm sure.

Who did you work with?  Which judges?

MS. DENNING:  Well, when I retired I worked for Judge Roy here in Syracuse

and before that I worked for Judge Tate and Judge Zeller in Madison County.

THE COURT:  All three fine judges.

MS. DENNING:  Yes, they were.  They are.

THE COURT:  All right, well, now you get to see the view from the other side.

MS. DENNING;  Right.

18

THE COURT:  All right.  Thank you.

Ms. Zamora.

MS. ZAMORA:  My name is Mary Zamora.  I'm from Liverpool, New York.  I work at Kippling Rescue Center New York and emergency road service counselor/call taker. I take road service calls for people that break down throughout Ithaca, Buffalo, Rochester, as far as Messina and Ogdensburg and I have five children; four girls, one boy; two teenagers, two that are going to be teenagers next year and a nine year old.  My hobbies are crocheting and basically involved with my children.

THE COURT:  And I see here that you're married?

MS. ZAMORA:  Yes.

THE COURT:  Your husband works where?

MS. ZAMORA:  He works out in Rome now.  He's a maintenance worker.  He works for the Syracuse Developmental Center and they stationed him out in Rome so he does maintenance work for all the homes with all the disabled.

THE COURT:  Great.  Thank you.

Mr. Fuller.

MR. FULLER:  My name is Philip Fuller.  I live in Bridgeport.  I work for a company called Health Care Services Group.  I work at St. Camillus in Syracuse.  I live on Oneida Lake so I enjoy fishing when it's a little warmer than this.

THE COURT:  Oh, you don't do the ice fishing?

MR. FULLER:  Oh, no, no.  Way too cold for that.

19

THE COURT:  How was the season this year?

MR. FULLER:  Not bad, not bad.  It's definitely changed since the zebra muscle moved in.

THE COURT:  And you are married, I see.

MR. FULLER:  Yes.

THE COURT:  Your spouse also works at St. Camillus?

MR. FULLER:  Yes, she does.

THE COURT:  All right.  Thank you.

Mr. Bartlett.

MR. BARTLETT:  David Bartlett.  I'm from Hamilton.  I live on Lake Lorraine.  Currently, right now, I'm unemployed but I work in construction, general construction and insulation.  Spent three years roofing.  I'm out of that now.  I basically snowboard, I'm into music, I play guitar.  Right now, I'm just waiting to get into another phase of a construction job as soon as all the paperwork goes through.

THE COURT:  And you're single?

MR. BARTLETT:  Yes.

THE COURT:  Okay.  Thank you.

Mr. Emm.

MR. EMM:  My name is William Emm.  I'm a retired carrier, 35 years.  I enjoy boating, fishing and camping and just watching T.V.

THE COURT:  Where do you like to fish?

20

MR. EMM:  I go up to St. Lawrence.

THE COURT:  Bass fishing?

MR. EMM:  Mostly bass.

THE COURT:  Okay.  Thank you.

Ms. Dwyer.

MS. DWYER:  Hi, I'm Sandy Dwyer.  I work for Liberty Travel in Cicero, been there about 14 years.  I have a son and two step-daughters.  My son is a high school senior.  We're looking at colleges.  That's pretty much our free time at the moment.  For hobbies, I enjoy photography and traveling.

THE COURT:  Great.  Thank you.

MR. MELNICK:  Good morning.

THE COURT:  Good morning.

MR. MELNICK:  My name is Walter Melnick.  I'm a confirmed bachelor and I don't have a job.  I'm retired.  I did work for the army recruiter downstairs on the fifth floor for 15 years in the office and my favorite thing is music, a lot of musicians here.  I'm a trumpet player and I volunteer in community bands around the area of Lafayette and Liverpool and my hobby is going to the casinos plus trips with the church group, volunteer in the church rectory, accounts payable, and I love boxing.

THE COURT:  Good.  All right.

MR. MELNICK:  -- Curt Johnson and Nick Treole [Ph.] Saturday night.

THE COURT:  So you can explain to the rest of them about my analogy later.

21

MR. MELNICK:  Sure.  And, also, I'm a singer with the Tom Dooley choiraleers [Ph.].

THE COURT:  No kidding.

MR. MELNICK:  Hobby.

THE COURT:  I think one of my former law partners sings with them, Gus Rorig.  Does he sing with them?

MR. MELNICK:  Not [inaudible].

THE COURT:  Tell me, are there classes for this confirmation process -- the confirmed bachelor?

MR. MELNICK:  Not that I know of.  Maybe I'll start one.

THE COURT:  Okay.  Thank you.

All right, Ms. Stevens.

MS. STEVENS:  Yes, my name is Sally Stevens.  I'm retired from the U.S. Postal Service as a route carrier for over 30 years and my husband and I have a draft horse barn [sic] and a [inaudible] and he drives a school bus and plows snow and we're up at 5:30 in the morning to get everything going and it's a privilege to be here.

THE COURT:  So you're ready for bed now?

MS. STEVENS:  Just about.

THE COURT:  Do you have any hobbies?

MS. STEVENS:  I like to sew.

THE COURT:  Great.  Thank you.

22

Let me ask you collectively a couple of questions?

Have any of you ever served as jurors in either a criminal or civil case or as a grand juror?

Okay.  We'll start right here.

Can you tell me when you served and what kind of case it was?

FEMALE JUROR:  There were two civil and one criminal and about fifteen years ago I had a job at the courthouse.

THE COURT:  Was there anything about that experience that left you with a bad taste in your mouth or you feel would effect your ability to be fair and impartial in this case?

FEMALE JUROR:  No.

THE COURT:  So you've served in both civil and criminal so you understand -- and, obviously, Judge Mordue will be giving you instructions on this -- but many of you, I'm sure, are familiar with the notion that in a criminal case the plaintiff -- or the government in that case -- must prove the defendant's guilt beyond a reasonable doubt.  It's a very high standard.  Now, this is a civil case and it's not subject to that same standard or burden of proof.  In a civil case in most instances the plaintiff must prove his or her case by what is known as a preponderance of the evidence so it's important that if you have any notion or experience in serving as a juror in a criminal case that you kind of put aside that experience and that notion and the whole concept of guilt beyond a reasonable doubt.

Do you think you'll have any difficulty in doing that?

FEMALE JUROR:  No.

23

THE COURT:  All right.

I saw your hand go up also.

MR. LEDERMAN:  I think it was about four years ago on the Onedoga County grand jury.

THE COURT:  Anything about that, Mr. Lederman, that -- it was a grand jury?

MR. LEDERMAN:  Yes.

THE COURT:  So you sat for an extended period of time?

MR. LEDERMAN:  Yes.

THE COURT:  And you know that in the grand jury, unlike this type of a setting, you typically only hear one side of the story.  You hear what the prosecution presents to you and then you find probable cause or no probable cause.

In this type of case it's very important that you keep an open mind throughout both the plaintiff's presentation and the defense presentation and not prejudge the case or draw any conclusions until you've heard all the evidence.

Any problem doing that and then putting aside your grand jury experience?

MR. LEDERMAN:  No.

THE COURT:  Okay.

I saw other hands up here in the front row.

Yes, ma'am.

FEMALE JUROR:  It was a county harassment case [inaudible].

THE COURT:  A criminal case?

24

FEMALE JUROR:  Yes.

THE COURT:  Anything about that experience that turned you off to the court system or the jury process?

FEMALE JUROR:  No.

THE COURT:  Yes, Mr. Houghton.

MR. HOUGHTON:  I was at the Onedoga courthouse on a DWI trial.  I was only there one day because after we were selected and got started, during the break they made a deal.

THE COURT:  Nothing about that experience that would effect your ability to serve in this case?

MR. HOUGHTON:  No.

THE COURT:  Ms. Piedmonte.

MS. PIEDMONTE:  I was an alternate on a murder case and the other two were to do with somebody suing the doctor and then they resolved it.  The other one I was one, it was to do with the office pulling over someone that had been drinking and they went to full --

THE COURT:  So in the other cases you did not deliberate but in the driving --

MS. PIEDMONTE:  Right.

THE COURT:  -- while intoxicated case you did.

Anything about the process that would effect your ability to be fair and impartial in this case?

MS. PIEDMONTE:  No.

25

THE COURT:  All right.

Anyone else?

All right.  So we've got some experienced jurors.

Has any of your or anyone in your immediate family ever participated in any lawsuit or been either as a party or in some other capacity as a witness, perhaps.

Yes.

FEMALE JUROR:  Well, I have a member of my family, she had to settle out of court, I guess.

THE COURT:  It was a civil case?

FEMALE JUROR:  No, it was a criminal case.

THE COURT:  A member of your family that was a criminal defendant?

FEMALE JUROR:  Yes.

THE COURT:  That ended up as a --

FEMALE JUROR:  They settled it.  Yes.

I guess I have a nephew that's serving time for a DWI [inaudible].

THE COURT:  It was a felony DWI?

FEMALE JUROR:  Well, I'm not sure.  He's serving weekends.

THE COURT:  At Jamesville?

FEMALE JUROR:  No.  In Madison.

THE COURT:  Madison.  All right.

Anything about either of those experiences that would in your view effect your

26

ability to be fair and impartial in this case?

FEMALE JUROR:  No.

THE COURT:  Have you had much contact with your nephew concerning the conditions that he faces when he serves his time?

FEMALE JUROR:  I talk to him and he realizes he needs to get some help.

THE COURT:  What I'm mostly interested in is do you have conversations about the prison conditions that he experiences when he is buoyant bars?

FEMALE JUROR:  Well, right now he is doing some trustee work so he is not there all weekend, he's not at the jail.  He's going out and working with some of the deputies.

THE COURT:  Do you feel that in any way that would effect your ability to be fair and impartial in this case which involves prison conditions?

FEMALE JUROR:  No.

THE COURT:  All right.  Thank you.

Anyone else?

Yes.

FEMALE JUROR:  I have a brother who is in jail.  It's also a DWI.  I don't have any contact with him but he's got to be somewhere by [inaudible].

THE COURT:  Was it a felony level?  Is he --

FEMALE JUROR:  I think so.

THE COURT:  So he'd be in the custody of the Department of Correctional Services.

27

Anything about that would make you uncomfortable sitting as a juror in this case which involves prison conditions in claims brought against members of the Department of Correctional Services?

FEMALE JUROR:  No.

THE COURT:  All right.

Thank you for your honesty.

Yes.

FEMALE JUROR:  My son's father is incarcerated in Florida.  He's not my husband.

THE COURT:  Right.

FEMALE JUROR:  It's my son's father.

THE COURT:  Right.

Anything about that that would effect your ability in your view to sit and decide this case?

FEMALE JUROR:  No.

THE COURT:  Okay.  Thanks.

All right.

Ladies and gentlemen, if you are to be selected to sit as jurors in this case can you assure both me and the parties in this case that you will decide the case and render a verdict solely on the evidence presented at the trial and in the context of the law as Judge Mordue gives it to you in his jury instructions disregarding any other ideas, notions or beliefs about

the law that you may have encountered in reaching your verdict?

(All respond)

THE COURT:  Okay.

Is there anyone that feels that they can't do that?

(No reply)

THE COURT:  Okay.

Do any of you have any special needs or problems that in your view would make it difficult or impossible to serve as a juror in this case?

Let me just say this, one thing that we try to do is to accommodate you, the jurors, because you're the most important part of this process so as the trial goes forward and as this selection process goes forward if any of you need a break or you need some special accommodation, either raise your hand or if you feel uncomfortable just mention it to the courtroom deputy -- my courtroom deputy or Dan McAllister, who is Judge Mordue's courtroom deputy -- and we'll try to accommodate you or to one of the courtroom security officers.

All right.

Having heard the questions put to you thus far is there any reason -- do any of you feel that there is a reason why you could not render a fair and impartial verdict in this case based on the evidence presented and the Court's instructions?

(No reply)

THE COURT:  Have any of you or any member of your immediate family served

29

as a member of law enforcement which would include a police officer, a position as a

probation officer, parole officer or corrections officer?

Yes, sir, Mr. Lederman.

MR. LEDERMAN:  My uncle is a police officer.

THE COURT:  Your uncle?

MR. LEDERMAN:  Uncle, yes.

THE COURT:  Still a police officer?

MR. LEDERMAN:  No, he's retired.

THE COURT:  With what agency?

MR. LEDERMAN:  West Seneca, New York police department.

THE COURT:  All right.

How long has he been retired?

MR. LEDERMAN:  Fifteen or twenty years.

THE COURT:  Anything about that that would make you more likely to believe a

police officer or the testimony of a police officer than any other person placed under oath and

testifying at trial?

MR. LEDERMAN:  No.

THE COURT:  Yes, sir.

MALE JUROR:  My father was a probation officer.

THE COURT:  With what agency?

MALE JUROR:  Madison County.

30

THE COURT:  Is he still?

MALE JUROR:  No.  He's retired now.

THE COURT:  Anything about his experiences that may effect your ability to be fair and impartial in this case?

MALE JUROR:  No.

THE COURT:  Were there any other hands?  Oh, quite a few.

Yes.

MALE JUROR:  My cousin was a Syracuse police officer.

THE COURT:  Is he still?

MALE JUROR:  No, he's retired.

THE COURT:  All right.

Anything about that that would effect your ability --

MALE JUROR:  No.

THE COURT:  All right.

I think I have Ms. Kinslow.

MS. KINSLOW:  My brother was just hired but I'm not sure that he was a special deputy or a guard.  He doesn't work in the [inaudible].

THE COURT:  Anything about that that would effect your ability to sit in this case in your view?

MS. KINSLOW:  No.

THE COURT:  Mr. Houghton, did I see your --

MR. HOUGHTON:  Well, I'm just going to mention this.  You didn't say this.  I don't believe -- she works at a criminal court [sic] she's a bailiff, my sister.  Does that come in -- I don't know if you want to ask me -- no, she never talks about anything except possibly the personnel and the judges.

THE COURT:  What court does she serve in?

Ms. Piedmonte, did you have your hand up?

MS. PIEDMONTE:  No.

THE COURT:  Yes.

MS. STEVENS:  Well, I did because my husband was the judge of the town where we lived and I didn't --

THE COURT:  Which town was that?

MS. STEVENS:  Spafford.

THE COURT:  Which --

MS. STEVENS:  Spafford.

THE COURT:  What's his name?

MS. STEVENS:  Brian [sic] Stevens.

THE COURT:  Oh, sure.

MS. STEVENS:  He's been out of that for a few years now.

THE COURT:  Okay.

MS. STEVENS:  I didn't know if it made a difference.

THE COURT:  Great.

32

MS. STEVENS:  It doesn't to me.

THE COURT:  And we already heard from you but you've got another?

MALE JUROR:  I have another one.  My nephew was the head federal police officer in this building until he retired, Mike McCarthy.

THE COURT:  Oh, okay.

MALE JUROR:  It doesn't effect my feelings.

THE COURT:  All right.

I already eluded to this but let me ask you, do any of you feel that because of their positions as law enforcement officials, people like corrections officers are more trustworthy as witnesses than others or are incapable of making false statements under oath?

Anyone feel that way about law enforcement officers?

(No reply)

THE COURT:  Have any of you ever had any experiences, positive or negative, with the New York State Department of Correctional Services that might interfere with your ability to serve as an impartial juror in this case?

(No reply)

THE COURT:  Have any of you ever been employed or any of your immediate family members been employed other than what we've already discussed with the state of New York or any of its agencies?

(No reply)

THE COURT:  All right.

33

We've already touched on incarceration of any other of you or members of your immediate family been incarcerated for any period of time?

(No reply)

THE COURT:  Now, the plaintiff in this case is a prison inmate.  Is there anything about his status that would impair your ability to be fair and impartial toward him, to treat him like any other litigant, to not prejudge the facts of this case until all of the evidence is heard and weighed in the context of the jury charge which will be administered at the close of proof?

Anyone have a problem in putting that status out of your mind and treating him fairly?

(No reply)

THE COURT:  Thank you.

Now, how are we doing?  Does anyone need a break?  Do you want to stand in place for five minutes, two minutes?

All right.

At this point let me do this.  I'm going to ask each of the attorneys -- I'm going to give them each twenty minutes to use at their discretion in asking any follow-up questions they may have.  Once that process is completed, we'll go through the jury selection and then we'll release you until next Tuesday.

Okay.

So if you can hang in there a little bit longer without lunch we'll get this done and

34

turn you loose and you can go holiday shopping.

All right.

Mr. Blair.

MR. BLAIR:  Folks, I don't have much to add by the way of questioning.

Generally, for you as a group, I think the Judge has covered all the basics which we would be concerned with.

I'm going to ask just a couple of specific follow-up questions for more information and then I'll turn matters over to my colleague, Attorney MacRae.

Ms. Galzer, you mentioned that you had served on jury duty previously and you mentioned both criminal and civil cases; is that correct?

MS. GALZER:  Yes.

MR. BLAIR:  Can you tell me the nature of the criminal cases for which you served as a juror?

MS. GALZER:  That was a burglary/robbery.

MR. BLAIR:  Can you describe the nature of the civil suits for which you served as a juror?

MS. GALZER:  I believe one was a DWI and I believe the second was also DWI. I'm not sure but I can't remember what the third was but I believe they both were DWI.

MR. BLAIR:  When you said you served as a juror on a civil suit, what did you mean by that?

MS. GALZER:  I was selected as a juror.

35

MR. BLAIR:  The DWI service that you rendered as a juror on those cases, were those misdemeanors?

MS. GALZER:  No, I believe one of them from what I remember was at that level.

MR. BLAIR:  Ms. Cole, in your role as team leader at The Hartford, do you have daily interaction with the claims department at all?

MS. COLE:  Yes, that would be [inaudible].

MR. BLAIR:  Okay.

I think you said that you oversee support and something having to do with data systems?

MS. COLE:  Yes.  People support being [inaudible] of other people.

MR. BLAIR:  That's fine.

Do you have any role with regards to evaluating any substantive parts of any claims at the company?

MS. COLE:  No.  The only part I would get involved in is if we have a problem with a claim, maybe systemwide [inaudible].

MR. BLAIR:  When you say systemwide, you're referring to a computer system?

MS. COLE:  Yes.

MR. BLAIR:  How the claims might be registered?

MS. COLE:  Right.  [Inaudible].

MR. BLAIR:  Do you have an immediate supervisor?

MS. COLE:  Yes.

36

MR. BLAIR:  What department might he or she be in?

MS. COLE:  Claims and comp.

MR. BLAIR:  Do you attend any policy meetings with regards to how claims are adjusted at The Hartford?

MS. COLE:  I have taken courses over the years but never actually handled claims. [Inaudible] but never actually did it.

MR. BLAIR:  In addition to subrogation courses, can you recall any of the other courses you might have --

MS. COLE:  Basic claims handling [inaudible].  All the rest were medical, medical terminology.

MR. BLAIR:  Medical terminology?

MS. COLE:  Yes.

MR. BLAIR:  Mrs. Denning.

MS. DENNING:  Yes.

MR. BLAIR:  You probably knew I was coming to you.

MS. DENNING:  Yes.

MR. BLAIR:  You've had substantial interaction with the court system so I feel the need to at least follow-up a little bit and find out about some of your experiences.

Have you had the opportunity to be personally in a courtroom during any type of trial involving prison inmates?

MS. DENNING:  No.

37

THE COURT:  Have you had the opportunity to work on --

MS. DENNING:  I take that back.

Yes, there was one instance when I was a secretary for Judge Tate.  He was released from jail but he wanted to come and see the Judge's files and there eventually was a trial and I had to go testify during the trial.

MR. BLAIR:  The trial somehow implicated the Court?

MS. DENNING:  Yes.

MR. BLAIR:  In the court records?

MS. DENNING:  Yes.

MR. BLAIR:  And you had to testify on behalf of the Court?

MS. DENNING:  Yes, the D.A.'s office.

MR. BLAIR:  You were a witness for the --

MS. DENNING:  Yes, for the D.A.'s office.

MR. BLAIR:  Is there anything about that process which you believe may taint your ability to be fair and impartial in such an action here?

MS. DENNING:  No.

THE COURT:  Have you had the opportunity during your time working in the criminal justice system to work on actual suits brought by prison inmates?

MS. DENNING:  Well, I worked in supreme court so that was usually civil matters. I didn't have much to do with the criminal court system.

MR. BLAIR:  We have a civil matter here involving someone who has been

38

incarcerated and my follow-up question to you is have you had the opportunity to work on a civil matter which may have been initiated by someone that was incarcerated?

MS. DENNING:  No.

MR. BLAIR:  Did judges that you worked for generally -- did you say weren't involved in a whole lot of criminal arraignments?

MS. DENNING:  No.  Namely supreme court civil matters.

MR. BLAIR:  Thank you.

Mr. Melnick.

MR. MELNICK:  Yes, sir.

MR. BLAIR:  How long did you spend as an army recruiter?

MR. MELNICK:  I wasn't a recruiter, I was just with the office.  I didn't recruit anybody.

MR. BLAIR:  Okay.

MR. MELNICK:  Fifteen years.

MR. BLAIR:  My understanding of the recruitment process is to do some background checks and be involved with --

MR. MELNICK:  I had nothing to do with that.  I just [inaudible] office personal records.  Office manager, I guess I'd call myself.  Clerk typist, answered the phone, take messages [inaudible].  Best part was I had a lady captain and a lady first sergeant at the time.  A lot of fun.

MR. BLAIR:  We won't talk about the army/navy game this past week will we?

39

MR. MELNICK:  I watched it.  I'm brokenhearted.  Well, they deserved it.  Army has [inaudible].

MR. BLAIR:  Mrs. Stevens.

MS. STEVENS:  Yes.

MR. BLAIR:  Your husband served as Spafford town judge for now long?

MS. STEVENS:  Nineteen years.

MR. BLAIR:  Needless to say, you've probably heard the phone ring many times in the middle of the night.

MS. STEVENS:  Oh, definitely.

MR. BLAIR:  I believe you said he's retired from that position now?

MS. STEVENS:  Yes, he is.

MR. BLAIR:  How long ago did he retire?

MS. STEVENS:  Oh, it's probably been six years maybe.

MR. BLAIR:  Is there a jail of any sort located in the Town of Spafford?

MS. STEVENS:  No, there isn't.

MR. BLAIR:  Have you had the occasion to accompany your husband to criminal arraignments from time to time?

MS. STEVENS:  Yes, I have.

MR. BLAIR:  Have you been present at any point in his court while he's conducted a trial whether criminal or civil?

MS. STEVENS:  We never held a trial.  I was his court clerk.  We had polled

40

people for juries before but it never got that far.

MR. BLAIR:  How long did you serve as Spafford court clerk?

MS. STEVENS:  Eighteen years.

MR. BLAIR:  That's all the specific questions I have for you as an individual and I'd like to thank you for your time in this very important part of our process.   As the Judge has already said, it's really up to you on where the cases go so we do appreciate your time and your attentiveness during all of the proceedings and with that I'll turn things over to Mr. MacRae.

THE COURT:  Thank you, Mr. Blair.

Mr. MacRae.

MR. MACRAE:  Thank you, Your Honor.

One of the benefits -- it's either a benefit or a disadvantage, I'm not sure which -- going last is I have the least to ask but also the least opportunity to interact.

I do have a few questions.

Let's see.

Ms. Denning.

Judge Peebles announced this as The Peebles Court.

MS. DENNING:  Yes.

MR. MACRAE:  I remember when I used to appear in front of Judge Tate and we used to refer to it as the Judge Tate Show because he was so entertaining.

MS. DENNING:  I thought you looked familiar from --

41

MR. MACRAE:  Yes, I'm sure you did.  I probably was carried out in a stretcher half the time from laughing after listening to some his jokes.

MS. DENNING:  Yes.

MR. MACRAE:  Now, your involvement in the types of cases that he had -- Judge Tate, Judge Zeller and Judge Roy -- they've all been involved in civil cases and that's what we have here.

Is that going to have any kind of an influence over the way in which you listen to the evidence here or weigh the testimony?   Do you think that it's going to impact on you in any way?

MS. DENNING:  I don't believe so.

MR. MACRAE:  You already know the Judge is going to be giving you charges.  I presume that in your years of experience you've prepared charges for those judges you worked for.

MS. DENNING:  Yes.

MR. MACRAE:  I don't want to go too far along this line but there is likely to be some differences between the charges you prepared and the ones that the Court will read to you in your deliberations here.

Can you assure me that you will set aside all of your years of experience in drafting and going through the charges that the judges you worked for prepared and use only the ones that the Court here will be giving you?

MS. DENNING:  Yes.

42

MR. MACRAE:  Okay.

Let's see.

There were a number of you who had relatives who were involved in law enforcement.  The Judge has already gotten your assurance that that won't have any influence in your decision and as I understand it -- now, I'm just going to look at you generally because I've got my notes but I have to actually try to read them and figure out who it was that responded to that.

Regardless of whether it's a positive or a negative influence, can I get your assurance that nobody is going to allow any exposure to people involved in law enforcement are going to have an influence or are you going to be influenced by that?

(Jurors respond non-verbally and verbally)

MR. MACRAE:  Does anybody here either personally or are you related to or know anyone who is a diabetic?

Are those people who are diabetics are they insulin-dependent, do you know?  Do you know if they do periodic blood sugar testing?  And are you familiar with that process, the way it's done?

(Jurors respond non-verbally and verbally)

MR. MACRAE:  Okay.

One of the issues in this case is going to be the manner in which a blood glucose test was conducted and you'll hear testimony about the manner in which -- the various claims made about the two clerks.

43

Is there anything about your personal experience or experience with people who are diabetic and do have to do regular blood glucose testing, is it going to effect on your ability to sit as a witness in this case?

MR. HOUGHTON:  Well, I would know that because I've given my wife blood glucose tests before and I know how it's done and I might see if something was done very wrong or something wasn't done.

MR. MACRAE:  U-hum.

I don't mean to pry too much but is your wife's diabetes the result of her auto accident but you participate in helping her take her --

MR. HOUGHTON:  Sometimes [inaudible].

MR. MACRAE:  Okay.

Now, when you say that it could influence your evaluation of the testimony here --

MR. HOUGHTON:  I don't know what I'd do here but I might say something like, "Why did they do that" or [inaudible].

MR. MACRAE:  Okay.

MR. HOUGHTON:  They have the same problem, you know [inaudible].

MR. MACRAE:  Well, I think it's fair to say no one expects that you as a juror would set aside your own personal knowledge or your own personal life experiences and come in here as a blank [inaudible] an impossible task but we all come in to any experience -- any circumstance with our own baggage, positive or negative.

What we really are looking for, though, is somebody who is going to, recognizing

44

that experience, recognizing that life that they come in here with, that they're willing to give the parties all their attention and make their best determination in the case based on the facts that they hear and evaluate them according to the instructions the Judge gives you.

Now, with that in mind do you believe that you would be able to waive the evidence fairly for both parties?

(Jurors respond non-verbally)

MR. MACRAE:  Okay.

That's really all we ask.

Is there anybody that feels that they couldn't do that and in particular, I'm talking about those of you who either have or know people who have diabetes?

(Jurors respond non-verbally)

MR. MACRAE:  Great.

That's really all I have to ask.

Thank you very much.

THE COURT:  Thank you, Mr. MacRae.

MR. MACRAE:  Thank you, Your Honor.

THE COURT:  All right.

At this time let me ask counsel -- this will be a yes or no question -- Mr. Blair, do you have any challenges for cause?

MR. BLAIR:  No, Your Honor.

THE COURT:  Mr. MacRae?

MR. MACRAE:  No, Your Honor.

THE COURT:  Good.

What we're going to do is I'm going to ask each of you to return to the back.  You can stretch.  We're going to spend about ten minutes in chambers going through the final selection process.  We'll come back, we'll determine who the lucky eight of you are that have been selected to serve and then we'll give you further instructions from there.  So take a few minutes, stretch, relax, there are restroom facilities in the jury room in the back here.

(Recess)

THE COURT:  All right.

Ladies and gentlemen, what I'm going to do is we'll call the eight jurors that are left standing after the selection process has been completed.

What we did was each of the counsel -- there are sixteen of you -- each counsel was required to exercise four, what we call, peremptory challenges.  Those are challenges that they can exercise for any reason.  They don't have to articulate a reason and, as I said, they were forced by the mathematics to use those four challenges each so that we could get to a jury or eight which is our practice.  In a civil case you can deliberate and reach a verdict with as few as six jurors.  We normally choose eight so that there are two alternates but all eight of you if you are still on the jury at the time of conclusion of proof will participate in the deliberation process and the arrival at a verdict.  So all eight of you are equally important as well as the others who are going to be excused.

So we're going to call eight names.  If one through four would be seated in the first

46

row and then five through eight in the second row and try to remember your position because when you come back on next Tuesday that's where you will be seated.

All right, Shelly, if you would, please.

THE CLERK:  Juror No. 1 is George Lederman.  Juror No. 2 is Susan Cole.  Juror No. 3 is Patricia Kinslow.  Juror No. 4 is Nancy Piedmonte.  Juror No. 5 is Mary Zamora.  Juror No. 6 is Philip Fuller.  Juror No. 7 is William Emm and Juror No. 8 is Sandra Dwyer.

THE COURT:  All right.

Let me thank those of you that were not selected for your service, your willingness to serve and for your candor in answering the questions of the Court and counsel.

You are free to go but only as far as the seventh floor.  You should report back to the jury coordinator on seven and they will give you instructions as to whether or not your further service will be required.

Again, you have the thanks of the Court for your participation.

As I said before, you folks will be beginning your trial in terms of the next phase next Tuesday at 9:00.  You should report to Judge Mordue's courtroom on the 12th floor of this building and try to remember your positions.  I'm not sure whether he seats one through six and then seven and eight or whether he seats four and four but you'll be one, two, three, four, five, six, seven and eight in any respect.

I think we have an excellent jury and I wish you well in your deliberations.

What I'm going to do is I'm going to ask counsel, is the jury satisfactory as presently constituted, gentlemen?

47

MR. BLAIR:  Yes, Your Honor.

MR. MACRAE:  Yes, Your Honor.

THE COURT:  Would you each rise and I'm going to  issue another oath.

THE CLERK:  Please raise your right hand.

(Jury panel sworn)

THE COURT:  All right.

You can be seated.

Before I release you let me say one additional thing.

I know that you don't know much about this case.  All that you really know is the thirty second thumbnail sketch that I gave you but it's important that you remember that between now and next Tuesday as well as any following adjournments, whether it's a lunch recess or whether it's an overnight adjournment, you should not discuss the case with anyone including each other.  You should try to keep an open mind until all of the proof is in and the Court has given you its instructions concerning the law.  You should also not read or listen to any accounts in the media concerning this case should there be any.  We want you to be fair and impartial and decide the case solely on what you hear in the courtroom from both the parties, the witnesses and the Court.

With that, I'm going to turn you loose.  Enjoy this day.  It's not often that we see the sun in Syracuse, New York in the wintertime.

Yes, ma'am.  I'm sorry.

FEMALE JUROR:  Could I just ask you a stupid question?  I'm sorry.

48

I know you said before next Tuesday, okay.  Do we still call in on Thursday or how does that work now?

THE COURT:  No.  You are now seated as jurors and so you're free.  There is no requirement to call in until -- you just appear next Tuesday morning.

FEMALE JUROR:  Right.  Thank you.

THE COURT:  That's not a stupid question, that was a very good question.

FEMALE JUROR:  What time does it start?  9:00?

THE COURT:  At 9:00, yes.  If you want to get there a little bit before 9:00, they'll have coffee on and I think he's going to try to start as soon after 9:00 as he can.

All right.

Thank you, folks.

* * * * *

I certify that the foregoing is a transcript from an electronic sound recording of the proceedings in the above-entitled matter.

_____

SHARI RIEMER

Dated:  April 2, 2005

49